**OUTTEN & GOLDEN LLP**
Gregory S. Chiarello
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
gchiarello@outtengolden.com

Hannah C. Meropol (pro hac vice forthcoming)
1 California St., 12th Floor
San Francisco, CA 94111
Telephone: (415) 715-1542
hmeropol@outtengolden.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AYSE IYIGUNDOGDU,<br><br>     Plaintiff,<br><br>  v.<br><br>PAYWARD, INC. (D/B/A KRAKEN DIGITAL ASSET EXCHANGE),<br><br>     Defendant. | Case No. 25-CV-9282<br><br>**COMPLAINT**<br><br>**<u>Demand for Trial by Jury</u>** |

## <u>NATURE OF THE ACTION</u>

1. Plaintiff Ayse Iyigundogdu ("Plaintiff"), by and through her attorneys Outten &

Golden LLP, brings this action against Defendant Payward, Inc. (d/b/a Kraken Digital Asset

Exchange) ("Defendant" or "Payward" or the "Company") for violating Title VII of the Civil

Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*; the New York State Human Rights

Law ("NYSHRL"), N.Y. Exec. L. §§ 290 *et seq.*; the New York Labor Law, as amended, N.Y.

Lab. L. Art. 6 ("NYLL"), § 193; and the New York City Human Rights Law ("NYCHRL"),

N.Y.C. Admin. Code §§ 8-101 *et seq.*

2. Plaintiff, a highly accomplished financial executive, in less than two years

ascended to become Payward's top salesperson across all products. In recognition of her leadership and efforts, Payward soon after promoted Plaintiff to Head of Institutional Sales and Relationships for the US/LATAM region. Plaintiff delivered transformative results for Payward in her new role. She rebuilt the sales team from scratch, brought substantial business to Payward by onboarding the Company's first exchange-traded funds ("ETF") clients, contributed greatly to the Company's Spot and Futures revenue, and developed a sales pipeline for the Company's Custody application, amounting to approximately $1 billion.

3.      Payward, however, halted Plaintiff's successful trajectory at the company in April 2023, when it assigned her to a new male manager, Tim Ogilvie ("Ogilvie"). Over the following months, Ogilvie systematically stripped her key responsibilities and gave them to male reports – male colleagues with whom Ogilvie had a previous relationship – inhibiting Plaintiff from attaining further success at Payward. He gave Plaintiff's Custody, ETF, and other client development responsibilities to her male colleagues, and excluded her from business opportunities related to those and other client relationships.

4.      Further underscoring Payward's preference for men to handle Plaintiff's role, Payward accelerated its efforts to diminish Plaintiff's role after becoming aware of Plaintiff's intention to become pregnant and need for time off for IVF and related treatments.

5.      Payward then weaponized Plaintiff's diminished role. Relying on Plaintiff's severely reduced responsibilities and Ogilvie's own failures to secure regulatory and licensing clearances for the Custody product, Payward fabricated unjustified performance concerns for Plaintiff's Q4 2023 performance review, delivered in Spring 2024. It then callously fired Plaintiff on July 8, 2024, when she was ten weeks pregnant.

6.      Further demonstrating Payward's bias against women, Payward also paid Plaintiff

less than men at similar levels, including the man to whom it gave much of her responsibility. Payward further reduced Plaintiff's compensation because of her gender and in comparison to her male colleagues by withholding commission compensation that she earned according to Payward's own policies.

7.      Accordingly, Plaintiff brings this action to hold Payward responsible for its illegal sex- and pregnancy-based discrimination under Title VII, the NYSHRL, and the NYCHRL, disability discrimination under the NYSHRL and NYCHRL, familial status discrimination under the NYSHRL, and for unpaid wages under the NYLL.

## JURISDICTION AND VENUE

8.      This case arises, in part, under federal statute, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. Therefore, this court has original jurisdiction of this matter pursuant to 28 U.S.C. § 1331.

9.      The claims Plaintiff brings under the NYSHRL, N.Y. Exec. L. §§ 290 *et seq.*, the NYCHRL, N.Y.C. Admin. Code §§ 8-101 *et seq*., and the NYLL, N.Y. Lab. L. Art. 6 ("NYLL"), § 193, arise out of the same events or omissions as the federal claim that is properly before this Court. Therefore, pursuant to 28 U.S.C. § 1367(a), the Court properly exercises supplemental jurisdiction over the NYSHRL, the NYCHRL, and the NYLL claims.

10.     This court also has original jurisdiction of this action pursuant to 28 U.S.C. § 1332, because the parties are citizens of different States and the amount in controversy exceeds $75,000.

11.     This Court has personal jurisdiction over Payward, because the company at all relevant times maintained an office in this District and because some of the acts complained of, and giving rise to the claims alleged, occurred in and emanated from this District.

12.    Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions in this action occurred within the Southern District of New York.

13.    Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") to exhaust her administrative remedies and comply with all statutory prerequisites related to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. and received a Notice of Right to Sue on August 13, 2025.

## PARTIES

Ayse Iyigundogdu

14.    Plaintiff, Ayse Iyigundogdu, is an adult woman residing in Brooklyn, New York and was located in Brooklyn, New York during relevant events identified herein.

15.    Plaintiff was at all relevant times an employee of Payward within the meaning of all applicable statutes.

Payward

16.    Defendant Payward is a cryptocurrency exchange and trading platform (d/b/a Kraken Digital Asset Exchange).

17.    Payward is a Delaware corporation with its U.S. headquarters in Cheyanne, Wyoming.

18.    During all relevant times, Payward maintained an office in New York, New York.

19.    During all relevant times, Payward was Plaintiff's employer within the meaning of all applicable statutes.

20.    During all relevant times, Payward employed Plaintiff in New York.

21.    At all relevant times, Payward employed Plaintiff's supervisor, Ogilvie, in New

York, New York.

22.    At all times relevant to Plaintiff's claims, Payward had more than fifteen (15) employees.

## FACTUAL ALLEGATIONS

### Background

23.    Plaintiff has spent her career in financial services and has over 15 years of expertise advising and managing institutional capital for the world's largest hedge funds and sovereign wealth funds. She has held executive leadership positions at BNP Paribas and Bloomberg, and has worked at the forefront of global financial strategy, trading, and market analysis. Her financial expertise spans foreign exchange, derivatives, and emerging markets, and she has served as a trusted advisor to major investors, driving high-value transactions and risk management strategies.

24.    Payward recruited Plaintiff in 2018 to build sales and manage relationships.

25.    Plaintiff was one of few women Payward employed in sales and/or management roles, and was the only woman reporting to Ogilvie during much of her tenure.

26.    Nevertheless, Plaintiff quickly proved herself, becoming the top salesperson across all of Payward's products. In 2020, two years later, Payward recognized her sales success with a promotion to Head of Institutional Sales and Relationships for the U.S. and Latin America (US/LATAM) region.

27.    In 2021, a large group of employees within the Payward sales team left the Company for a competitor. Plaintiff had the option to leave as well, and would have earned more money if she had done so. However, she was passionate about her job at Payward and chose not to leave, rebuilding a second successful sales team from scratch.

28.     Through Plaintiff's efforts and extensive industry connections, she did much to build Payward's fledgling business. Plaintiff onboarded what would become Payward's first ETF clients, Valkyrie and Bitwise, opening up Payward's ETF revenue stream in 2023. In the first half of 2024 alone, Spot revenue attributable to Plaintiff (i.e., revenue for trades of assets at their current value, versus "Futures" trades that involve contracts for a future transaction) totaled more than $4 million – a significant amount given her limited client base, market conditions, and regulatory restrictions on certain types of trading.

29.     In recognition of Plaintiff's contributions to the Company, Payward frequently and publicly praised Plaintiff's performance. For example, Plaintiff's manager for several years, Caine Knight ("Knight"), rated her performance as "Above Expectations" in her bi-annual review for H2 2022, writing, "Ayse has added massive value to the company this half with her sales efforts and leadership and mentoring of new team members. Her strategic thinking, industry knowledge and and [*sic*] ability to influence enabled an Institutional Custody product to be green-lighted by execs after 4 years of others trying. Ayse is a huge asset to Kraken and I feel lucky to have her on my team." Another manager review commented on Plaintiff's "precious energy" and "amazing skills," writing, "Amazing team member. Amazing willingness to succeed."

30.     In April 2023, Plaintiff received a new manager, Ogilvie, presently Payward's Head of Global Institutional, after her prior manager, Knight, transitioned from Sales to Account Management. Ogilvie came to Payward through its acquisition of Staked – a non-custodial staking platform. He was not familiar with the trading and lending functions of Payward's business.

31.     Plaintiff's role at the time focused on building out the pipeline for ETF investors

and, with full support from Payward's management, developing a sales pipeline for Payward's Custody (i.e., clearing house) application. Over the following six months, she attracted approximately $1 billion in the sales revenue pipelines for ETF and Custody, each.

**Plaintiff Began Fertility Treatments and Put Payward on Notice of the Same**

32.     While Plaintiff was extremely successful in her professional career, she struggled personally with infertility and starting a family. Plaintiff was vocal about this concern with her work colleagues at Payward, including Ogilvie.

33.     In December 2023, Plaintiff decided to explore treatment for in vitro fertilization ("IVF"). However, Payward's -insurance provider at the time did not provide coverage for the IVF benefits Plaintiff sought. In January 2024, Plaintiff petitioned Payward's Human Resources ("HR") team to expand its health care benefits to include coverage this benefit.

34.     In the ensuing discussions, the HR team revealed to Plaintiff that Payward's executive leadership team members, which included Ogilvie and Global Head of Institutional Sales, David Olsson ("Olsson"), were aware of her requests for expanded health insurance coverage for IVF treatment benefits.

35.     In addition, Payward's internal system had "tagged" Olsson to view Plaintiff's service desk ticket with her inquiries.

36.     Payward agreed to add coverage for the IVF benefits Plaintiff sought. On information and belief, the benefit was added at an increased cost to the Company.

37.     HR shared the news of this expanded benefits coverage with Plaintiff and Payward's leadership, including Ogilvie, and told Plaintiff that she could start treatment as they worked out the health insurance logistics.

38.     Around that time, Plaintiff discussed with Ogilvie that she would need time off

work to attend fertility treatment appointments in New York City. Specifically, in February 2024, shortly following Payward's approval of her IVF benefits coverage, Plaintiff told Ogilvie that she would need to attend related gynecological appointments and procedures, requiring her to be out of the office. Ogilvie was aware of the nature and purpose of these appointments and, therefore, of Plaintiff's intention to become pregnant.

39.    By March 2024, with Payward's knowledge, Plaintiff began attending fertility appointments every other day for a period of two weeks during regular working hours. She later took one and a half days off of work for each of her egg retrieval and embryo transfer surgeries. She thereafter attended follow-up medical appointments every four or five days for a period of approximately two months. All of Plaintiff's fertility appointments and procedures occurred in New York City.

40.    Plaintiff noted her absences on her calendar and would remind Ogilvie and others of her upcoming absences if she perceived a scheduling conflict. Where these appointments and procedures conflicted with Plaintiff's work meetings, including a couple of ETF meetings, Plaintiff informed Ogilvie that she would miss the meetings due to her gynecological care and arranged for her team to attend on her behalf.

**Payward Took Away Plaintiff's Responsibilities, Transferred Her Clients to Male Peers, and Fabricated Performance Concerns**

41.    Soon after Ogilvie became Plaintiff's supervisor, and despite Plaintiff's demonstrated success in her role, Ogilvie began to divest Plaintiff from her core responsibilities and transition them to less-qualified men while attributing her work and success to those men. Payward accelerated this differential and negative treatment after becoming aware of Plaintiff's intention to become pregnant.

42.    Plaintiff's core responsibilities at the time Ogilvie became her manager in 2023

were to lead marketing and development for Payward's Custody clearing house application, and to continue to lead development of the ETF client pipeline; areas which, as noted above, Plaintiff demonstrated great success.

43.    From 2023 to today, Custody and ETF were and continue to be important for Payward.

44.    Ogilvie never discussed with Plaintiff any change in Company priorities or provided criticisms of Plaintiff's specific performance in her role. However, after Ogilvie became Plaintiff's supervisor, and particularly after Payward became aware of Plaintiff's intent to become pregnant, Payward diminished Plaintiff's role significantly, re-allocating her responsibilities to two men unfamiliar with the products.

45.    Payward created Custody as a product to compete with other cryptocurrency exchanges, such as CoinBase, who have in-house facilities to clear cryptocurrency trades. Plaintiff was instrumental to Custody's creation and growth. She pitched the product to Payward's senior executives in August 2021 and earned their approval to begin its yearslong development. Once Custody was in its final stages of development, Plaintiff built its sales pipeline beginning in early 2023, educating her colleagues about the product, creating pricing models and operational processes, and then leveraging the sales team to develop market interest in the product and onboard clients to the platform according to Payward's instructions. At that time, Custody was still under development and could not yet handle funds. Even so, Plaintiff was able to generate substantial interest in the nascent product pre-launch, including by securing a significant pipeline of potential users for the product, which would eventually generate significant fees for the Company.

46.    Beginning in 2023 and into 2024, Ogilvie began to transition responsibility for

Custody away from Plaintiff and to her male colleague, Jonathon Marcus ("Marcus"), the former

head of Staked, even though Marcus, a software developer, had a technical, rather than

institutional or sales, background. Marcus nevertheless soon enjoyed the fruits of Plaintiff's prior

work, taking credit for her success and working directly with Plaintiff's reports, including,

Institutional Sales & Relationship Manager Daniel Berman ("Berman"). Without any discussion

with Plaintiff, Marcus told Berman that he would be covering Custody moving forward,

indicating that Plaintiff was no longer the primary lead.

47.     Ogilvie and Marcus excluded Plaintiff from Custody marketing meetings and

prioritization calls that she had previously regularly attended. Around February 2024, Ogilvie

also staffed Marcus with Plaintiff on hiring interviews for Custody, further diminishing her role.

48.     Due to the time it takes for a sale to move from development to completion,

Marcus and Payward benefitted greatly from Plaintiff's years-long efforts to cultivate sales

development relationships with numerous investors, many of whom were personal connections

she had sourced directly for these deals. Aware of this fact, Ogilvie nevertheless gave attribution

to Marcus for the successful completion of these sales.

49.     For example, Plaintiff was responsible for sourcing many of the major clients in

Payward's ETF pipeline, which included Valkyrie (Kraken's first ETF client), Bitwise,

Grayscale, Franklin Templeton, Wisdom Tree, and Hashdex. Many of these clients had worked

with Plaintiff or one of her reports (at her direction) since 2021.

50.     Ogilvie also encouraged Olsson, who was a male friend of his, to take over

Plaintiff's ETF, Custody, marketing, and product-related responsibilities. Olsson joined Payward

from Blockfi (another crypto company) in late 2022 shortly before Blockfi filed for bankruptcy.

51.     Despite her demonstrated success in developing the Custody and other sales

pipelines for Payward, Ogilvie displaced Plaintiff in favor of Olsson, who did not have the same track record of success with Kraken's Custody and other clients.

52. Like Marcus, Olsson side-stepped Plaintiff to work directly with her direct reports, including Institutional Sales & Relationship Manager Garrett Grinnell, to contact clients – many who had direct relationships with Plaintiff – without Plaintiff's knowledge.

53. Ogilvie and Olsson also excluded Plaintiff from meetings and communications related to her work, and Olsson took credit for work developed by Plaintiff's reports under her direction and supervision.

54. Aside from the Custody and ETF pipelines, Ogilvie and Olsson excluded Plaintiff from her other client development efforts as well. For example, early in 2024, Ogilvie told Plaintiff that she should not pursue Garanti BBVA as a prospect. While she disagreed with this assessment, she complied with Ogilvie's instruction to focus her efforts elsewhere. Yet, just a few months later, Ogilvie and Olsson together pursued Garanti BBVA without involving Plaintiff, even though Plaintiff already had a relationship with Garanti BBVA and was Payward's primary contact with it. Ogilvie later credited Olsson with securing Garanti BBVA as a client, ignoring that Plaintiff in the first instance had sourced and developed the client for Payward over several years.

55. Payward's efforts to take over Plaintiff's client relationships not only diminished her role at the Company, but it also tarnished her professional reputation. For example, prior to beginning her IVF treatments, Plaintiff was deeply involved in onboarding one of her biggest client accounts, Laser Digital, as it began to integrate on Over-The-Counter ("OTC"), Spot, and Futures trading, as well as staking and lending. The onboarding process for such a large client account can take two years or longer. Plaintiff's role as Payward's lead representative for this

client – a relationship she began in 2022 – was plainly documented in Payward's Relationship Management systems, Trident and Hubspot. However, Olsson feigned ignorance about Plaintiff's well-documented role in developing Payward's relationship with Laser Digital, and instead reached out to Laser Digital directly without informing or including Plaintiff.

56.     In doing so, Olsson disrupted the client relationship, using an unapproved communication channel – Telegram – to communicate with the client, rather than over the established and approved Slack channel already in use, triggering a violation of Laser Digital's compliance policies. Olsson's lack of diligence and professionalism in an effort to steal Plaintiff's client relationship reflected poorly on Plaintiff and jeopardized an already committed client with the Company.

57.     Upon information and belief, Payward did not discipline Olsson for this transgression.

58.     Similarly, Olsson attempted to take credit for the relationships Plaintiff spent years developing with Hidden Road and a particularly high-value Futures and Spot trading client, Velar Technologies. Notably, Velar Technologies was just months away from making a substantial trade that Plaintiff expected to result in a significant commission for her. Ogilvie and Olsson were well aware of Plaintiff's work developing business with Velar Technologies when they stripped her of her responsibilities and encouraged one of Olsson's direct reports to take over the relationship instead of Plaintiff, just in time for him to reap the benefits of her years of hard work. As a result, Plaintiff did not receive the commission associated with the trade.

59.     Ogilvie never offered explanation to Plaintiff for why Payward removed her responsibilities and gave them to Marcus and Olsson, despite her repeated inquiries.

**Payward Unlawfully Fired Plaintiff**

60.    In Spring 2024 – shortly after Plaintiff began fertility treatments – Ogilvie wrote Plaintiff's Q4 2023 performance review. Much to Plaintiff's surprise, Payward littered the review with patently false and unjustifiably critical assessments of her performance. The Q4 2023 review, which Ogilvie inexplicably sent Olsson to deliver in his stead, was a significant departure from each and every one of her prior stellar performance reviews.

61.    Plaintiff's Q4 2023 performance review also directly contradicted the frequent, well-documented praise Plaintiff received over WhatsApp and emails before Ogilvie became her supervisor and in her early tenure reporting to him, prior to when she began discussing her fertility plans with the Company.

62.    Plaintiff was surprised to learn that, in preparing her Q4 2023 review, Ogilvie did not contact the four peers she had identified to provide feedback. For as long as Plaintiff had worked at Payward, it was standard protocol to incorporate peer feedback into employee performance reviews and, to her knowledge, this protocol was followed for all other employees' Q4 2023 reviews.

63.    Plaintiff's performance was consistently strong throughout her employment, including in the months after Ogilvie became her manager. Indeed, while the Custody product faced a number of challenges, those challenges were attributable to regulatory factors outside Payward's control and to Ogilvie, who was responsible for all of Payward's Custody teams including Product, Engineering, Legal, Marketing, and Sales.

64.    Payward significantly delayed Custody's launch date throughout 2024 due to glitches in product development, such that the clients that Plaintiff onboarded were unable to transfer funds.

65.     Payward's Custody launch was also delayed because Ogilvie did not fulfill his responsibility to secure necessary regulatory and licensing clearances to allow the product to go live.

66.     Ogilvie also gave Plaintiff conflicting directives on which users could be onboarded to Custody, modifying his direction on address requirements just a week before one of Custody's projected launch dates, even though he had been aware of the need to update Plaintiff for some time. Ogilvie had intentionally withheld this information from Plaintiff; after finally providing her with the new address requirements (which meant some of the prospective Custody users could not be onboarded to the product), Ogilvie chided Plaintiff, "You will be an embarrassment." Plaintiff, however, deprived Ogilvie of the satisfaction and was nevertheless able to scramble to rebuild a significant product pipeline, notwithstanding that the Company ultimately was not able to launch Custody because the product still was not yet ready for roll out.

67.     Following Plaintiff's Q4 2023 review in early 2024, Ogilvie further distanced himself from Plaintiff, and failed to show for a scheduled meeting in or around April 2024 to deliver Plaintiff's Q1 2024 performance feedback. He also never provided Plaintiff with any written feedback for this period.

68.     Plaintiff's fertility treatments were successful, and in May 2024 she became pregnant. Ogilvie and Olsson were aware of Plaintiff's pregnancy. Plaintiff notified Ogilvie that she would be unable to travel to a conference in May 2024 due to her ongoing treatment and embryo transfer procedure.

69.     About two months later, on July 8, 2024, Ogilvie notified Plaintiff that Payward was terminating her employment and placing her on a garden leave until her final date of employment on August 15, 2024. Ogilvie did not provide a reason or explanation for the

termination decision, although Ogilvie did acknowledge that many people, including the Chief of Staff to the CEO, Alison Ford, did not know Payward was terminating Plaintiff's employment.

70. Plaintiff asked if there were any other roles available at Payward to which she could transfer, but Ogilvie said no without any further discussion.

71. Wasting no time, on a Custody team call that same day, Ogilvie had Marcus present Plaintiff's slides prepared for the meeting as if they were his own work.

**Payward Paid Plaintiff Significantly Less than Male Colleagues, and Failed to Pay Her Earned Commissions**

72. Payward paid Plaintiff far less than comparable male employees in senior roles at the Company, and also in comparison to the market more broadly. For many years at Payward, Plaintiff's salary was $145,000 (or less). Yet in early 2024, Payward hired Berman as a junior, male employee reporting to Plaintiff, with a base salary of $160,000. Only then did Payward increase Plaintiff's salary, and only to $173,000, just $13,000 more than Berman, compared to whom she had significantly more experience, client relationships, and demonstrated contributions to the Company.

73. Despite Berman's lack of experience or accomplishment in relation to Plaintiff, he now holds the same title Plaintiff held at the time Payward fired her. On information and belief, Berman's compensation is greater than Plaintiff's was at the time she held the same title.

74. On information and belief, many men in positions of similar seniority to Plaintiff with similar or less experience and tenure than Plaintiff earned $50,000 or more than her salary. This included male Product Marketing Managers and a male Head of Business Development, Benjamin Reid. Additionally, Olsson was at the same level as Plaintiff and performed similar work, yet earned a base salary between $250,000 and $300,000.

75. Further reducing Plaintiff's compensation, Payward failed to abide by its policy to

pay her earned commission compensation for revenue generated from clients she originated and onboarded, dating back to 2023. Specifically, until about Q1 2023, Payward paid Plaintiff approximately $450,000 in commissions for revenue generated on trades for different products, including Spot trading volume, Futures trading volume, Margin trades, ETF trades, Staking, and OTC. After Ogilvie became Plaintiff's supervisor, however, Payward infrequently paid or stopped paying altogether Plaintiff's commissions.

76.     When Plaintiff raised concerns about unpaid earned commissions, Ogilvie responded via Slack message that he was too busy to finalize her commission payments. Ogilvie finally assigned Olsson to calculate the Futures, Spot, Staking, and Margin commissions for 2024. However, Olsson lied to Plaintiff, and said that he was unable to gather the necessary information from Payward's Account Management department to calculate the payments, something which was never an issue in the past since Payward's own data analytics team maintained the data.

77.     Plaintiff estimates that Payward owes her commissions of approximately $250,000 or more.

78.     On information and belief, male employees on the Staked and Account Management teams, also supervised by Ogilvie, received commissions in 2024 and 2025.

79.     Payward has further failed to pay Plaintiff earned compensation related to total assets under Custody that she generated for the product. In September 2023 and on numerous occasions thereafter, Ogilvie told Plaintiff that she would receive a commission of six percent of the 0.25 percent fee that Payward earned for facilitating the exchange of assets under Custody for assets she signed on to the product. At the time of Plaintiff's termination, Payward owed Plaintiff commissions on approximately $40 million or more in assets under Custody that she generated

for the product.

80.    Given that Plaintiff generated approximately $1 billion in the sales pipeline for Custody, Payward's illegal termination of Plaintiff's employment deprived her of significant additional commission payments.

81.    Payward has also failed to pay Plaintiff earned bonus compensation of approximately $5,000 to $10,000 for a high profile candidate, Victor Saez, she referred to Payward for employment.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Gender, Pregnancy, and Disability Discrimination in Violation of
New York City Human Rights Law (N.Y.C. Admin. Code § 8-801 *et seq.*)**

82.    Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

83.    Defendant violated the NYCHRL by discriminating against Plaintiff because of her gender and reproductive health decisions (including her fertility-related IVF treatment) in the terms and conditions of her employment, including but not limited to giving her responsibilities to less-qualified men; excluding her from business opportunities related to those and other client relationships; fabricating performance criticisms; withholding earned commissions; and paying her less than men in similar roles. Payward accelerated this differential and negative treatment after becoming aware of Plaintiff's intention to become pregnant and seek fertility treatment, including IVF.

84.    Defendant further violated the NYCHRL by terminating Plaintiff's employment because of her gender, pregnancy, and/or reproductive choices.

85.    Defendant further violated the NYCHRL by engaging in the acts described herein

because of Plaintiff's disability, need for medical treatment, and/or time off for the same.

86.     Plaintiff is entitled to damages as a result of Defendant's unlawful acts, including past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

87.     Defendant's unlawful and discriminatory actions constitute willful or wanton negligence, recklessness, a conscious disregard for the rights of others, or conduct so reckless as to amount to such disregard, for which Plaintiff is entitled to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**Gender, Pregnancy, Familial Status, and Disability Discrimination in Violation of New York State Human Rights Law (N.Y. Exec. L. §§ 290 *et seq.*)**

88.     Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

89.     Defendant violated the NYSHRL by discriminating against Plaintiff because of her sex in the terms and conditions of her employment, including but not limited to giving her responsibilities to less-qualified men; excluding her from business opportunities related to those and other client relationships; fabricating performance criticisms; withholding earned commissions; and paying her less than men in similar roles. Payward accelerated this differential and negative treatment after becoming aware of Plaintiff's intention to become pregnant and seek fertility treatment, including IVF.

90.     Defendant further violated the NYSHRL by terminating Plaintiff because of her pregnancy and/or sex.

91.     Defendant further violated the NYSHRL by engaging in the acts described herein because of Plaintiff's familial status.

92.     Defendant further violated the NYSHRL by engaging in the acts described herein because of Plaintiff's disability, need for medical treatment, and/or time off for the same.

93.     Defendant's unlawful and discriminatory actions constitute willful or wanton negligence, recklessness, a conscious disregard for the rights of others, or conduct so reckless as to amount to such disregard, for which Plaintiff is entitled to an award of punitive damages.

94.     Plaintiff is entitled to damages as a result of Defendant's unlawful acts, including, but not limited to, past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

### THIRD CAUSE OF ACTION
**Gender and Pregnancy Discrimination in Violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2)**

95.     Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

96.     Defendant violated Title VII by discriminating against Plaintiff because of her sex in the terms and conditions of her employment, including but not limited to giving her responsibilities to less-qualified men; excluding her from business opportunities related to those and other client relationships; fabricating performance criticisms; withholding earned commissions; and paying her less than men in similar roles. Payward accelerated this differential and negative treatment after becoming aware of Plaintiff's intention to become pregnant and seek fertility treatment, including IVF.

97.     Defendant further violated Title VII by terminating Plaintiff because of her pregnancy and/or sex.

98.     Defendant acted with malice or reckless indifference to Plaintiff's federally protected rights.

99.     Plaintiff is entitled to damages as a result of Defendant's unlawful acts, including, but not limited to, past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

### FOURTH CAUSE OF ACTION
**Failure to Pay Wages in Violation of
New York Labor Law (NYLL Article 6, § 193)**

100.     Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

101.     The foregoing conduct, as alleged, violates the NYLL.

102.     At all relevant times, Defendant acted as Plaintiff's "employer" under NYLL § 190.

103.     At all relevant times, Plaintiff was an "employee" of Defendant under NYLL § 190.

104.     Pursuant to NYLL § 193, no employer shall make any deduction from the wages of an employee except as authorized by law.

105.     Defendant made unlawful deductions and/or failed to pay Plaintiff's earned wages owed under the terms of her employment.

106.     Defendant's failure to pay wages was willful and not in good faith, within the meaning of NYLL § 198(1-a).

107.     As a result of Defendant's conduct, Plaintiff has suffered damages in the amount of the unpaid wages due and owing, together with liquidated damages, prejudgment interest, and

reasonable attorneys' fees and costs as provided by the NYLL.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

A.      Declare the acts and practices complained of herein to be violations of Title VII, the NYSHRL, the NYCHRL, and the NYLL;

B.      Enjoin and permanently restrain these violations of Title VII, the NYSHRL, the NYCHRL, and the NYLL;

C.      Award Plaintiff damages to make her whole for all earnings she would have received but for Defendant's unlawful treatment, including, but not limited to, wages, bonuses, equity awards, pension and retirement benefits, health care coverage, and other lost benefits, including future lost wages and benefits;

D.      Direct Defendant to pay punitive damages under Title VII, the NYSHRL, and the NYCHRL in an amount to be determined by the jury;

E.      Direct Defendant to pay liquidated damages under the NYLL.

F.      Award Plaintiff damages to compensate for any adverse tax consequences;

G.      Award pre-judgment interest at the statutory rate of 9%;

H.      Award Plaintiff attorneys' fees, costs, and disbursements pursuant to applicable law.; and

I.      Award such other legal and equitable relief as this Court deems necessary, just, and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by this complaint.


Dated:   New York, New York
         November 6, 2025

Respectfully submitted,

Gregory S. Chiarello
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2071
gchiarello@outtengolden.com

Hannah C. Meropol (pro hac vice forthcoming)
**OUTTEN & GOLDEN LLP**
1 California St., 12th Floor
San Francisco, CA 94111
Telephone: (415) 715-1542
hmeropol@outtengolden.com

*Attorneys for Plaintiff*